**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

BOARD OF TRUSTEES SHEET METAL WORKERS' NATIONAL PENSION FUND, *et al*.,

Plaintiffs,

v.

PACIFIC BIM SERVICES, LLC,

Defendant.

Civil Action No. 1:25-cv-2297-PTG-WEF

# REPORT AND RECOMMENDATION

Plaintiffs, the separate and individual Boards of Trustees of the Sheet Metal Workers' National Pension Fund ("NPF"), the International Training Institute for the Sheet Metal and Air Conditioning Industry ("ITI"), the Sheet Metal Workers' International Association Scholarship Fund ("Scholarship Fund"), the Sheet Metal Workers' Occupational Health Institute Trust ("SMOHIT"), and the National Energy Management Institute Committee ("NEMIC") (collectively, the "Funds"), initiated this action pursuant to Sections 502(a)(3), (d)(1), (g)(2), and 515 of the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"), 29 U.S.C. §§ 1132(a)(3), (d)(1), (g)(2), and 1145, and Section 301(a) of the Labor Management Relations Act of 1947, *as amended* ("LMRA"), 29 U.S.C. § 185, against Defendant Pacific BIM Services, LLC ("Pacific BIM") for unpaid contributions, liquidated damages, interest, audit fees, and attorneys' fees and costs. Dkt. 1.[1]

---

[1] The relevant filings before the Court include Plaintiffs' Complaint ("Compl.") (Dkt. 1); Plaintiffs' Motion for Default Judgment ("Mot. Default J.") (Dkt. 7); Brief in Support of Plaintiffs' Motion for Default Judgment ("Mem. Supp.") (Dkt. 8); Declaration of Ellen Odell ("Odell Decl"(Dkt. 8-1); Declaration of Diana M. Bardes ("Bardes Decl.") (Dkt. 8-2); Supplemental Brief in Support of Plaintiffs' Motion for Default Judgment ("Suppl. Mem. Supp."); and all attachments and exhibits submitted with those filings.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the undersigned United States Magistrate Judge has reviewed the Motion for Default Judgment and relevant pleadings and is filing with the Court these findings of fact and recommendations. A copy of this Report and Recommendation will be provided to all interested parties.

For the reasons set forth below, the undersigned recommends the Court:

(1) **GRANT** Plaintiffs' Motion for Default Judgment against Pacific BIM;

(2) **ENTER** judgment against Pacific BIM in the total amount of $39,365.02, consisting of (i) $20,641.40 in total delinquent contributions, (ii) $5,872.87 in accrued interest on those delinquent contributions through March 6, 2026, (iii) $5,872.87 in liquidated damages, (iv) $2,050.00 in audit testing fees, and (v) $4,927.88 in attorney's fees and costs.

(3) **AWARD** interest on the delinquent contributions at the contractually agreed-upon rate of 0.0233% per day, compounded daily, from March 7, 2026 until paid in full; and

(4) **AWARD** post-judgment interest, to be calculated in accordance with 28 U.S.C. § 1961, on the awarded liquidated damages, audit testing fees, and attorney's fees and costs.

## I. Summary of Plaintiffs' Claims and the Undersigned's Recommendations

On December 9, 2025, Plaintiffs filed this lawsuit against Pacific BIM pursuant to Sections 502(a)(3), (d)(1), (g)(2) and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), (d)(1), (g)(2) and 1145, and Section 301(a) of LMRA, 29 U.S.C. § 185. Compl. ¶ 1. Plaintiffs allege that Pacific BIM was bound by and breached a collective bargaining agreement ("CBA") with the International Association of Sheet Metal, Air, Rail and Transportation Union (formerly known as the Sheet Metal Workers' International Association), Local Union 66 ("Local 66"), a labor organization representing employees in an industry affecting interstate commerce within the meaning of the LMRA. Compl. ¶ 12. The CBA required Pacific BIM, among other things, to submit monthly remittance reports and fringe benefit contributions to the Plaintiff Funds for

all hours worked by covered employees within the jurisdiction of Local 66. *Id.* ¶ 15. In addition, the CBA barred Pacific BIM from subcontracting work to any contractor, subcontractor, or other person or entity that had not agreed in writing to comply with the CBA's employment conditions. *Id.* ¶ 14. Plaintiffs allege that Pacific BIM failed to satisfy these obligations by failing to report certain employees performing covered work and subcontracting covered work in violation of the CBA. *Id.* ¶¶ 18, 21.

In 2024, the Funds conducted an audit of Pacific BIM's payroll records for the period of January 2020 through December 2022. Odell Decl. ¶ 16. The audit determined that Pacific BIM had underreported hours worked by its covered employees and, as a result, underpaid contributions for certain months within the audit period. Odell Decl. ¶ 17. In addition, the audit determined that Pacific BIM improperly subcontracted covered work in violation of the CBA during the period January 2022 through March 2025. Odell Decl. ¶ 18, 19.

As a result of the delinquent contributions identified for the period January 2020 through December 2022 and for the continued subcontracting violations that were identified for the period of January 2023 through March 2025, Plaintiffs seek a total of $39,365.02 in damages, consisting of: (1) $2,764.71 in delinquent contributions for the audit period January 2020 through December 2022; (2) $17,876.69 in delinquent contributions as a result of the subcontracting violations for the period January 2022 through March 2025; (3) $5,872.87 in interest on all delinquent contributions (calculated through March 6, 2026), to be increased at a rate of 0.0233% per day, compounded daily, until paid in full; (4) $5,872.87 in liquidated damages (calculated as the greater of the accrued interest on the delinquent contributions or twenty percent (20%) of the delinquent contributions); (5) $2,050.00 in audit testing fees; and (6) $4,927.88 in attorney's fees and costs. Mem. Supp. 5–6; Odell Decl. ¶ 21; Ex. 9; Bardes

Decl. ¶¶ 5–6; Suppl. Mem. Supp. at 3 (setting forth corrections and clarifications to the damages requested).

**II. Service of Process**

Before a court can render default judgment, it must be satisfied that the defaulting party has been properly served. Under Federal Rule of Civil Procedure 4(h), a corporation may be served, in relevant part, "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant."

On December 15, 2025, Plaintiffs served Pacific BIM by providing the summons, Complaint, and related materials to Debbie Payne, who is a registered agent designated by law to accept service of process on behalf of Pacific BIM. Dkt. 4. Ms. Payne was served at 3400 Capitol Blvd. SE, Suite 101 Tumwater, Washington 98501, which is the address of Pacific BIM's registered agent. Dkt. 4. Accordingly, the record establishes that Pacific BIM was properly served in accordance with the Federal Rules of Civil Procedure.

**III. Clerk of Court's Entry of Default and Plaintiffs' Motion for Default Judgment**

Federal Rule of Civil Procedure 55 establishes a two-step process for obtaining a default judgment. First, the plaintiff must request that the Clerk of Court enter default when the defendant fails to "plead or otherwise defend." Fed. R. Civ. P. 55(a); *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011). Such failure constitutes an admission of liability by the defendant. Once the Clerk of Court enters the defendant's default, the second step requires the plaintiff to apply to the court for a default judgment. This "converts the defendant's admission of liability into a final judgment that terminates the

litigation and awards the plaintiff any relief to which the court decides it is entitled…." *Mickalis Pawn Shop, LLC*, 645 F.3d at 128; *see also Home Port Rentals, Inc. v. Ruben*, 957 F.2d 126, 133 (4th Cir. 1992). However, a default judgment is not automatically granted as a matter of right. Rather, "[a] court confronted with a motion for default judgment is required to exercise sound judicial discretion in determining whether the judgment should be entered…." *JTH Tax, Inc. v. Grabert*, 8 F. Supp. 3d 731, 736 (E.D. Va. 2014).

*1. Pacific BIM is in Default*

As noted above, Pacific BIM was properly served with the summons, Complaint, and related materials on December 15, 2025, in accordance with the Federal Rules of Civil Procedure. Dkt. 4. However, Pacific BIM failed to appear or file an answer or other responsive pleading within the twenty-one (21) day period prescribed by Federal Rule of Civil Procedure 12(a)(1)(A)(i), which expired on January 5, 2026. As a result, on January 28, 2026, Plaintiffs filed a Request and Affidavit for Clerk's Entry of Default against Pacific BIM pursuant to Rule 55(a). Dkt. 5. Because Pacific BIM failed to file a responsive pleading or otherwise defend, the Clerk of Court entered a default against Pacific BIM on January 29, 2026. Dkt. 6. Accordingly, the record establishes that Pacific BIM is in default.

*2. Plaintiffs' Motion for Default Judgment*

Plaintiffs filed the instant Motion for Default Judgment, accompanying memorandum, declarations, supporting documentation, and notice of hearing on February 5, 2026. Dkt. Nos. 7–9. On March 6, 2026, Pacific BIM failed to appear for the hearing on the Motion before the undersigned and the undersigned took the matter under advisement to issue this Report and Recommendation. Dkt. 10. On March 13, 2026, Plaintiffs filed a Supplemental Brief in Support of their Motion for Default Judgment, correcting and clarifying the relief sought. Dkt.

11.

**IV. Jurisdiction**

Before entering default judgment in this matter, the Court must have subject-matter jurisdiction over the claims asserted and personal jurisdiction over Pacific BIM.

*First*, the undersigned finds that this Court has proper subject-matter jurisdiction. A federal district court has subject-matter jurisdiction over ERISA actions pursuant to the jurisdictional provisions in 29 U.S.C. §§ 1132(e), 1132(f), and 1451(c) and over LMRA actions pursuant to the jurisdictional provisions in 29 U.S.C. § 185(c). In addition, jurisdiction is proper under 28 U.S.C. § 1331, which grants federal courts original jurisdiction over all civil actions "arising under the Constitution, laws, or treaties of the United States." Here, Plaintiffs assert claims under ERISA and LMRA, which are both federal statutes. Compl. ¶ 1. Accordingly, this action arises under the laws of the United States.

*Second*, the undersigned finds that this Court has personal jurisdiction over Pacific BIM. Under ERISA's nationwide service of process provision, personal jurisdiction is proper where a defendant has been validly served and maintains sufficient contacts with the United States such that the exercise of jurisdiction is consistent with the Fifth Amendment of the Constitution. *See* 29 U.S.C. § 1132(e)(2); *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 443–44 (4th Cir. 2015) (citation omitted) ("Where a defendant has been validly served pursuant to a federal statute's nationwide service of process provision, a district court has personal jurisdiction over the defendant so long as jurisdiction comports with the Fifth Amendment."); *see also Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. McD Metals, Inc.*, 964 F. Supp. 1040, 1045 (E.D. Va. 1997).

To succeed in a Fifth Amendment challenge to personal jurisdiction, a defendant must

demonstrate that "the district court's assertion of personal jurisdiction over [them] would result in 'such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy' reflected in the nationwide service of process provision." *Denny's, Inc. v. Cake*, 364 F.3d 521, 524 n.2 (4th Cir. 2004) (quoting *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 627 (4th Cir. 1997). Where a defendant resides in the United States, it is "highly unusual ... that inconvenience will rise to a level of constitutional concern." *ESAB*, 126 F.3d at 627 (internal quotation marks omitted). Here, as noted above, Plaintiffs properly served Pacific BIM in accordance with the Federal Rules of Civil Procedure. Dkt. 4. In addition, at all times relevant to this action, Pacific BIM has been incorporated in the state of Washington with a principal place of business at 5608 17th Ave. NW, #547, Seattle, WA 98107. Compl. ¶ 11. Accordingly, based on valid service of process and Pacific BIM's substantial contacts with the United States, this Court's exercise of personal jurisdiction over Pacific BIM is proper and comports with the Fifth Amendment.

**V. Venue**

Before entering default judgment against Pacific BIM, the Court must be satisfied that venue is proper in this judicial district. Under ERISA, venue is appropriate in the federal district where the plan is administered. *See* 29 U.S.C. § 1132(e)(2) ("Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered …."). Venue is therefore proper in this district because Plaintiff Funds are administered in this district at 3180 Fairview Park Drive, Suite 400, Falls Church, VA 22042.[2] Compl. ¶ 5–9; Odell Decl. ¶ 3.

2 The Court takes judicial notice of the fact that Falls Church, Virginia is located in the Eastern District of Virginia.

**VI. Pacific BIM's Liability**

On a motion for default judgment, the defendant in default is deemed to have admitted the complaint's non-conclusory "well-pleaded allegations of fact" and the Court must evaluate whether the complaint "states a claim upon which relief can be granted" by applying the standards used in motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 613 n.3 (E.D. Va. 2003); *Grabert*, 8 F. Supp. 3d at 736, 739 (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001)); *see* also *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face); *Burbach Broad Co. of Delaware v. Elkins Radio Corp*., 278 F.3d 401, 406 (4th Cir. 2002) (court will "assume the facts alleged in the complaint are true and draw all reasonable factual inferences in [the plaintiff's] favor"). "Where a complaint offers only 'labels and conclusions' or 'naked assertion[s] devoid of further factual enhancement,' the allegations therein are not well-pleaded and, consistent with the Court's discretion to grant default judgment, relief should be denied." *Vasquez-Padilla v. Medco Properties, LLC*, Civ. No. PX-16-3740, 2017 WL 4747063, at *2 (D. Md. Oct. 20, 2017) (collecting cases) (citations omitted).

*1. Plaintiffs' Well-Pleaded Allegations of Fact*

The undersigned finds the following facts to have been properly pleaded and therefore deemed admitted.

*A. The Parties*

The Plaintiff Funds are employee benefit plans/trust funds within the meaning of ERISA, or joint labor-management organizations, that provide benefits to certain collectively-bargained sheet metal workers. Compl. ¶¶ 5–10; Odell Decl. ¶ 3. The Trustees of the Plaintiff

Funds bring this action in their collective names or, as necessary or appropriate, in the name of the respective trusts or plans, and their participants, and beneficiaries pursuant to Federal Rule of Civil Procedure 17. Compl. ¶ 10. As previously noted, the Plaintiff Funds are administered in this district with their principal place of business in Falls Church, Virginia. Odell Decl. ¶ 3.

At all times relevant to this action, Pacific BIM has been an employer within the meaning of 29 U.S.C. § 152(2) and Section 3(5) of ERISA, 29 U.S.C. § 1002(5), and has been engaged in an industry affecting commerce within the meanings of Sections 3(11) and (12) of ERISA, 29 U.S.C. §§ 1002(11) and (12). *Id.* ¶ 11. In addition, as noted above, during the relevant period, Pacific BIM has been incorporated in the state of Washington with a principal place of business located at 5608 17th Ave. NW, #547, Seattle, Washington, 98107. *Id.*

*B. Pacific BIM's Contractual Obligations*

In 2015, SMACNA Western Washington ("SMACNA") entered into a CBA with Local 66 effective for the period of June 1, 2015 through May 31, 2018 ("2015 CBA"). Odell Decl. ¶ 4; see Ex. 1. On May 21, 2018, Pacific BIM executed an agreement binding itself to the terms of the 2015 CBA. Odell Decl. ¶ 5; Ex. 2.

In 2018, SMACNA and Local 66 negotiated a successor agreement effective for the period June 1, 2018 through May 31, 2024 (the "2018 CBA"). Odell Decl. ¶ 7; see Ex. 3. As a member of SMACNA, Pacific BIM was bound to the 2018 CBA. Odell Decl. ¶ 7.

Pursuant to Article XIV, Section 5 of the CBAs, Pacific BIM "authorize[d] SMACNA Western Washington to act as its collective bargaining representative for all matters relating to this Agreement." Odell Decl., Ex. 1, Art. XIV, Sec. 5. Article XIV, Section 5 of the CBAs further provides that Pacific BIM would "hereafter be a member of the multi-employer

bargaining unit represented by said Association unless this authorization is withdrawn by written notice to the Association and [Local 66] at least one hundred and fifty (150) days prior to the then current expiration date of this Agreement." *Id.* In addition, Article XIV, Section 1 of the 2018 CBA states that "[t]his Agreement and Addenda Numbers 1 through 3 attached hereto shall become effective on the 1st day of June, 2018 and remain in full force and effect until the 31st day of May, 2024 and shall continue in force from year to year thereafter unless written notice of reopening is given not less than ninety (90) days prior to the expiration date." Odell Decl., Ex. 3, Art. XIV, Sec. 1. The Funds allege that Pacific BIM has not withdrawn membership from SMACNA to date. Odell Decl. ¶ 6.

Pursuant to Article II of the CBAs, Pacific BIM may not "assign any of the work described herein which is to be performed at a Jobsite to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein including, without limitations, those relating to union security, rates of pay and working conditions, hiring and other matters covered hereby for the duration of the project." Odell Decl., Exs. 1, 3, Art. II, Sec. 1.

Pursuant to Article VIII, Section 13 of the CBAs and Addendum 1, Article VII, Pacific BIM is obligated to submit monthly remittance reports and fringe benefit contributions to the Plaintiff Funds for all hours worked on behalf of its covered employees within the jurisdiction of Local 66. Compl. ¶ 15; Odell Decl. ¶ 9; Exs. 1 & 3, Art. VII, Sec. 13, Add. 1, Art. VII. The remittance reports are required to list all employees for whom contributions are due, all hours worked by those employees, all hours for which the employees were paid, and the wages and fringe benefits due on behalf of covered employees. Odell Decl. ¶ 11. These reports and accompanying contribution payments are due to the Plaintiff Funds by the twentieth day after

the end of each month during which covered work was performed and are delinquent if received thereafter. *Id.*; Exs. 1 & 3, Add. 1, Art. VII, Sec. 2. Compl. ¶ 19.

In addition, pursuant to the CBAs, Pacific BIM is also obligated to abide by the terms and conditions of the trust agreements establishing the Funds, including any amendments thereto and policies and procedures adopted by the Boards of Trustees (the "Trust Document"). Odell Decl. ¶ 10; Exs. 1 & 3, Art. VII, Sec. 13. Exhibit 4 to the Declaration of Ellen Odell is a copy of the Trust Document. Dkt. 8-1.

Finally, Article V, Section 3 of the Trust Document authorizes the Plaintiff Funds to audit contributing employers to verify the accuracy of reported information and to ensure that all required contributions have been remitted. Odell Decl. ¶ 13, Ex. 4, Art. V, Sec. 3; Compl. ¶ 20. Specifically, the Trust Document provides that the "Trustees have the authority to conduct an audit of the entire personnel, payroll wage records encompassing all employees and any job or project information of any Employer for the purposes of assuring the accuracy of reports and Contributions, compliance with any applicable law, and compliance with the terms of the Trust Document, the Plan Document, rehabilitation plan or funding improvement plan or any other document governing the Plan." Odell Decl., Ex. 4, Art. V, Sec. 3. Participating employers selected for such an audit must make available certain documents to the auditor, including "original time cards/sheets, payroll registers, individual earnings records, 941's, state U/C's, W-2's, W-3's and 1099's, cash disbursement journals, National Benefit Funds remittance reports/records, remittance reports for any other fringe benefit fund to which the Employer contributes, personnel records, and such other records as are necessary to complete the audit." Odell Decl. ¶ 14.

*C. Pacific BIM's Delinquent Contributions and Violations of the CBA's Subcontracting Provision*

First, Plaintiffs allege that Pacific BIM failed to comply with its statutory and contractual obligations to timely and fully remit contributions to the Funds on behalf of its covered employees for the period January 2020 through December 2022. Compl. ¶ 26.

Second, Plaintiffs allege that Pacific BIM subcontracted work covered by the CBA to Benjamin Ibarra in violation of the CBA's subcontracting provision and failed to make required contributions for work he performed during the period January 2022 through March 2025. *Id.*; Odell Decl., Ex. 8. As discussed below, the undersigned finds the Plaintiff Funds are entitled to recovery for damages incurred between June 1, 2024 through March 2025 even though the 2018 CBA expired on May 31, 2024.

*2. Federal Rule of Civil Procedure 12(b)(6) Analysis*

Now, as explained above, the undersigned must evaluate whether the Complaint states a "claim upon which relief can be granted" under ERISA and LMRA by applying the standards used in motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).

Section 515 of ERISA requires "every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement [to] ... make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. Under Section 515, "an employer that is contractually obligated to make contributions to a retirement fund must do so in accordance with the operative collective bargaining agreement. Section 515 thereby creates a federal right of action allowing a multiemployer pension plan to collect delinquent contributions." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 445 (4th Cir. 2015) (citing *Bakery & Confectionary Union and Indus. Int'l*

*Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1020–21 (4th Cir. 1997)). Separate from ERISA, Section 301 of LMRA permits federal suits against employers for breaching collective bargaining agreements. 29 U.S.C. § 185(a) ("Suits for violation of contracts between an employer and a labor organization representing employees ... may be brought in any district court of the United States having jurisdiction of the parties[.]"). LMRA serves as a separate vehicle for relief and supplements the relief provided by ERISA. *See Burgher v. Feightner,* 722 F.2d 1356, 1359 (7th Cir. 1983) (the enforcement provisions of ERISA were "intended to supplement rather than supersede the right existing under 29 U.S.C. § 185(a)").

In support of their claims under ERISA and LMRA, Plaintiffs allege the following relevant facts:

*First*, at all times relevant to this action, Pacific BIM was signatory to, and bound by, the CBAs with Local 66. Odell Decl. ¶ 7. On May 21, 2018, Defendant executed an agreement binding itself to the terms of the 2015 CBA. Odell Decl., Ex. 2. SMACNA and Local 66 subsequently negotiated the 2018 CBA for the period June 1, 2018 through May 31, 2024.

*Second,* Pacific BIM has not withdrawn membership from SMACNA to date. *Id.* ¶ 6. As a member of SMACNA, Pacific BIM was bound to the 2018 CBA. Odell Decl. ¶ 7.

*Third*, Article XIV, Section 5 of the CBAs provides that Pacific BIM would "hereafter be a member of the multi-employer bargaining unit represented by said Association unless this authorization is withdrawn by written notice to the Association and [Local 66] at least one hundred and fifty (150) days prior to the then current expiration date of this Agreement." Odell Decl., Ex. 1, Art. XIV, Sec. 5. In addition, Article XIV, Section 1 of the 2018 CBA states that "[t]his Agreement and Addenda Numbers 1 through 3 attached hereto shall become effective on the 1st day of June, 2018 and remain in full force and effect until the 31st day of May, 2024

and shall continue in force from year to year thereafter unless written notice of reopening is given not less than ninety (90) days prior to the expiration date." Odell Decl., Ex. 2, Art. XIV, Sec. 1.

*Fourth*, pursuant to the CBAs, Pacific BIM was obligated to abide by the terms and conditions of the Trust Document establishing the Funds, including any amendments thereto and policies and procedures adopted by the Boards of Trustees. *Id.* ¶ 16.

*Fifth*, at all times relevant to this action, Pacific BIM employed workers who were represented for the purposes of collective bargaining by Local 66. Compl. ¶ 12.

*Sixth*, pursuant to the CBAs, Pacific BIM was obligated to submit monthly remittance reports and fringe benefit contributions to the Funds for all hours worked on behalf of Pacific BIM's covered employees within the jurisdiction of Local 66. *Id.* ¶ 15.

*Seventh*, the CBAs prohibit subcontracting "to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment" contained within the CBAs. *Id.* ¶ 14.

*Eighth*, the Trust Document provides that the Funds may audit a contributing employer for the purposes of assuring the accuracy of reports and ensuring that such employer has remitted the appropriate amount of contributions to the Funds. *Id.* ¶ 20.

*Ninth*, in 2024, the Funds conducted an audit of Pacific BIM's payroll records for the period January 2020 through December 2022. *Id.* ¶ 22; Odell Decl. ¶ 16.

*Tenth,* the 2024 audit determined that Pacific BIM failed to comply with its statutory and contractual obligations to timely and fully remit contributions on behalf of covered employees for the period January 2020 through December 2022. Odell Decl. ¶ 16.

*Eleventh,* the audit determined that Pacific BIM subcontracted work to Benjamin Ibarra

during the period January 2022 through March 2025. Odell Decl. ¶ 18; Compl. ¶ 22. Pacific BIM subsequently provided invoices to Plaintiffs for work performed by Mr. Ibarra for the period of January 2023 through March 2025. Odell Decl. ¶ 20.

*Twelfth,* Mr. Ibarra performed Building Information Modeling ("BIM") services for Pacific BIM, which fall within the scope of Article I of the CBA covering "the preparation of all shop and field sketches whether manually drawn or computer assisted used in fabrication or erection." Odell Decl. ¶ 18.

*Thirteenth,* Pacific BIM failed to timely and fully remit contributions for the hours worked by Mr. Ibarra and "Mr. Ibarra did not agree in writing to comply with the conditions of employment contained within the CBA nor did he actually comply with the conditions of employment contained within the CBA." Mem. Supp. at 12.

*A. Delinquent Contributions for the Period January 2020 through December 2022*

These facts, deemed admitted as to Pacific BIM, satisfy all elements necessary to state a valid claim for relief for delinquent contributions for the period January 2020 through December 2022 under ERISA and LMRA. Accordingly, the undersigned concludes that Plaintiffs have satisfied their burden under Federal Rule of Civil Procedure 12(b)(6) with respect to this claim.

*B. Subcontracting Violations for the period January 2022 through March 2025*

At the outset, the record establishes that Pacific BIM was bound by the 2018 CBA and the Trust Document for the period May 31, 2024 through March 2025. Although the 2018 CBA formally terminated on May 31, 2024, it contains two evergreen provisions that continue to bind Pacific BIM to the CBA absent timely written termination. Under Article XIV, Section 5, Pacific BIM remains a member of the multi-employer bargaining unit represented by SMACNA unless it withdraws authorization by providing written notice to SMACNA or Local

66 at least one hundred and fifty (150) days prior to the CBA's expiration. Odell Decl. ¶ 6. In addition, Article XIV, Section 1 permits early termination of the 2018 CBA only upon written notice of "reopening" not less than ninety (90) days before the expiration date and provides that, absent such notice, the agreement automatically renews on a year-to-year basis. *Id.*, Ex. 3, Art. XIV, Sec. 1.

A CBA containing evergreen provisions such as these remains in full force and effect beyond its stated expiration date until it is timely and properly terminated. *See Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1156 (7th Cir. 1989) (holding that a 1979–1982 CBA containing an evergreen clause continued in effect beyond its stated expiration date where the employer failed to provide timely written notice of termination and therefore remained obligated to contribute to the pension and welfare funds through 1985). Because Pacific BIM's failure to provide written notice of withdrawal from SMACNA is deemed admitted, the undersigned finds that Pacific BIM remained a member of the multi-employer bargaining unit represented by SMACNA even after the termination date of the CBA. In addition, there is no evidence in the record that SMACNA terminated the 2018 CBA. Accordingly, the undersigned finds that Pacific BIM remained bound by the 2018 CBA through at least March 2025.

In the alternative, the undersigned finds that Pacific BIM was bound by the 2018 CBA for the period extending beyond May 31, 2024 because its conduct manifested an intent to be bound by its terms.[3] In *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 42 F.4th 300, 310 (4th Cir. 2022), the Fourth Circuit held that an employer may manifest assent to a CBA through its conduct, including by complying with a payroll audit authorized

[3] Although Plaintiffs did not expressly advance this argument in their Motion for Default Judgment, the Court may consider it based on the admitted facts in the record.

by the agreement. Similarly, in *Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Services, Inc.*, 791 F.3d 436, 448 (4th Cir. 2015), the court held that an employer may adopt a CBA by "manifesting an intention to be bound by its terms" and rejected the argument that an employer is not bound absent an express agreement.

Here, Pacific BIM complied with the 2024 payroll audit authorized by the 2018 CBA and Trust Document and produced invoices to Plaintiffs for work performed by Mr. Ibarra during the period January 2023 through March 2025. Odell Decl. ¶ 20; Ex. 7. Accordingly, the record establishes that Pacific BIM adopted the 2018 CBA by "manifesting an intention to [remain] bound by its terms."

Next, based on the well-pleaded facts deemed admitted, Plaintiffs have demonstrated that Pacific BIM violated the 2018 CBA by subcontracting covered work to Mr. Ibarra. Article II of the CBAs prohibit Pacific BIM from assigning covered work "to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein," including provisions relating to union security, wages, and working conditions, for the duration of the project. Odell Decl., Exs. 1 & 3, Art. II, Sec. 1. The 2024 audit determined that Mr. Ibarra performed work within the scope of Article I of the CBA during the period January 2022 through March 2025, yet no contributions were made for the hours he worked, and he neither agreed in writing to be bound by the 2018 CBA nor complied with its terms. Mem. Supp. at 12. Had Pacific BIM complied with Article II, it would have been required to either hire an employee or subcontract the work to an entity bound to the CBA in writing and remit contributions to Plaintiffs based on the hours worked. Accordingly, the record establishes that Pacific BIM breached the CBA by subcontracting covered work to Mr. Ibarra during the period January 2022 through March 2025 and failing to

remit corresponding contributions.

Having found that Pacific BIM breached the 2018 CBA, the undersigned turns to whether Plaintiffs may recover contributions for the subcontracted work under Section 515 of ERISA or Section 301 of LMRA, where the subcontractor did not agree in writing to be bound by the CBA and the agreement contains no provision imposing a direct or secondary guarantee obligation on Pacific BIM for the subcontractor's contributions. Although neither this Court nor the Fourth Circuit has addressed this issue directly, the undersigned finds that, in light of the facts deemed admitted, the Fourth Circuit's guidance regarding the purpose of Section 515 of ERISA, and persuasive authority from the Seventh, Ninth, Tenth, and D.C. Circuits, Plaintiffs are "entitled to damages in a sum equal to that which they would have received if the [2018 CBA] … had been fully performed by all parties." *Trs. of Teamsters Const. Workers Loc. No. 13, Health & Welfare Tr. Fund for Colorado v. Hawg N Action, Inc.*, 651 F.2d 1384, 1387 (10th Cir. 1981).

Awarding contributions for these subcontracting violations is consistent with and effectuates the purposes of Section 515 of ERISA as articulated by the Fourth Circuit. Multiemployer pension plans pool contributions from multiple employers into a single fund that pays benefits to covered employees, allowing benefits to follow workers across jobs while spreading costs and risks among employers. *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135 (4th Cir. 2019). Participation, however, creates systemic risk: "if one participating employer fails to make a contribution to the plan—whether because their CBA has expired, they have gone out of business, or otherwise—the remaining employers must then make larger contributions or employees must receive reduced benefits to cover the shortfall." *Id.* These "'rising costs may encourage—or force—further withdrawals,

thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base.'" *Id.* (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 n.2 (1984)). "This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue." *Id.* (quoting *Pension Benefit Guar. Corp.*, 467 U.S. at 722 n.2) (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) (en banc) ("Multi-employer plans are defined-contribution in, defined-benefit out. Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize[.]")).

To address this risk, Congress enacted Section 515 of ERISA with the "goal of stabilizing plans that had suffered financial setbacks when participating employers ceased contributing to the plan." *Id.* As noted above, Section 515 of ERISA requires "[e]very employer who is obligated to make contributions [to] make such contributions in accordance with the terms and conditions" of the plan or CBA, and gives plans a federal cause of action to enforce those obligations. Section 515 "bestows favored status" on multiemployer plans and places them in a "stronger position to collect outstanding contributions than they [would] otherwise occupy under common law contract principles," allowing them to enforce contribution requirements "as written." *Id.* As a result, Section 515 "strengthens" the position of multiemployer plans by ensuring that employers are held to "the literal terms of their written commitments," such that "the actual intent of the contracting parties…is immaterial when the meaning of [the] language is clear." *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997). In this context, Section 515 was designed to "increase[] the reliability of [a multiemployer plan's] income streams, reduce[] the cost and delay associated with collection actions, and reduce[] or eliminate[] the

cost of monitoring the formation of collective bargaining agreements." *Id.* at 1022.

Awarding damages equal to the amount Plaintiffs would have received had the 2018 CBA been fully performed by all parties promotes the reliability of the Funds' expected income stream by preventing Pacific BIM from circumventing its obligations under the CBA through subcontracting. The Funds reasonably expect to receive contributions for covered work, regardless of whether that work is performed directly by the signatory employer or indirectly through a subcontractor. Mem. Supp. at 11. Moreover, awarding such contributions alleviates the burden on Plaintiffs to enforce the terms of CBAs and monitor employer compliance. To conclude that contributions are unavailable under these circumstances, based on the absence of an explicit provision in the 2018 CBA requiring Pacific BIM to remit contributions where a subcontractor fails to do so, would leave Plaintiffs without a "remedy for [Pacific BIM's] undisputed breach of contract," an outcome Section 515 of ERISA was specifically intended to prevent. *Trustees of the Teamsters Construction Workers Local No. 13 v. Hawg N Action, Inc.*, 651 F.2d 1384 (10th Cir. 1981).

The weight of persuasive authority further supports an award of contributions for the subcontracting violations alleged by Plaintiffs. In *Flynn v. Dick Corp.*, the D.C. Circuit considered a multiemployer plan's claim for contributions under Section 515 based on an employer's violation of its CBA's subcontracting clause. 481 F.3d 824, 829 (D.C. Cir. 2007). The contract language at issue provided: "[t]he Employer agrees that neither he nor any of his subcontractors on the jobsite, will contract or subcontract work coming under the trade or territorial jurisdiction of [the union], to be done at the site of construction . . . except to a person, firm or corporation bound to this agreement." *Id.* at 831. Because the employer breached this provision by subcontracting to non-union subcontractors, the D.C. Circuit held that the plan

was "entitled to damages resulting from the breach in the form of benefit contributions in a sum equal to that which they would have received if the agreement between the defendant and the union had been fully performed by all parties." *Id.* at 832 (quotation marks and citations omitted). Critically, the court reached this conclusion notwithstanding the absence of any explicit CBA provision imposing secondary liability on the employer for a subcontractor's unpaid contributions.

Similarly, in *Trustees of the Teamsters Construction Workers Local No. 13 v. Hawg N Action, Inc.*, the Tenth Circuit addressed a CBA requiring that, if the employer subcontracted "any of its work the subcontract shall provide that the subcontractor shall abide by all of the terms of the agreement." 651 F.2d 1384, 1386 (10th Cir. 1981). It was undisputed that "none of the subcontracts entered into by the defendant required the subcontractor to make payments to the employer-union trust funds." *Id.* The court therefore concluded that the breach of the agreement was "well-established," leaving "the only remaining matter" as "the measure of damages." *Id.* The court held that "the trustees are entitled to damages in a sum equal to that which they would have received if the agreement between the defendant and the union had been fully performed by all parties." *Id.* at 1386–87. The court rejected the defendant employer's argument that "though it agreed to require any subcontractor to make payments into the trust funds, it did not agree to make such payments if the subcontractor failed to do so." *Id.* Rather, the court noted that it was "not impressed with this attempted distinction," and cautioned that "to accept this particular argument would mean that the trustees would have no remedy for defendant's undisputed breach of contract." *Id.*

In *Chi. Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Karr Bros.*, the Seventh Circuit considered a CBA that included a clause providing

that the "[e]mployer agrees that he will not sublet any work to any Employee." 755 F.2d 1285, 1287 (7th Cir. 1985). The Seventh Circuit affirmed the district court's order requiring the defendant to pay the plaintiffs $6,820.28, representing the amount the employer would have been required to contribute to the funds had it used employees rather than independent contractors. *Id.* The defendant argued that the damages awarded violated section 302(c)(5) of LMRA, 29 U.S.C. § 186(c)(5) (1976), which permits contributions to trust funds only "for the sole and exclusive benefit of the employees of the employer, and their families ...." *Id.* at 1289. According to defendant, because the district court found that defendant engaged independent contractors, and not employees, "the court's requirement that defendant contribute to the trust funds based on the number of hours worked by these independent contractors violates section 302." *Id.*

The court rejected that argument and ultimately held that "the district court correctly required defendant to pay plaintiffs the amount that defendant would have been required to contribute to the trust funds if it had complied with the collective bargaining agreements and hired employees." The court emphasized that "this remedy comports with the principle that breach of contract damages should place the aggrieved party in the place he would have been in had the breach not occurred." *Id.*

Lastly, in *Seymour v. Hull & Moreland Eng'g*, the Ninth Circuit considered a CBA's subcontracting clause providing that "if any Employer sublet any part or portion of his work covered by this Agreement to any other Employer or Sub-employer, the provisions of this Agreement shall be binding upon and applicable to all work performed by said Sub-employer on the job site." 605 F.2d 1105, 1115 (9th Cir. 1979). In light of this provision, the court held that the defendant employers were required to make contributions "measured by the hours

worked by such non-employees." *Id*. The court reasoned that "[i]f the union cannot compel payments to fringe benefit funds based upon [the subcontracting clause], then there is little that it can enforce under that article." *Id.*

For the foregoing reasons, the undersigned finds that Plaintiffs have satisfied their burden under Federal Rule of Civil Procedure 12(b)(6) with respect to the subcontracting violations during the period January 2022 through March 2025 and, pursuant to Section 515 of ERISA or Section 301 of LMRA, are entitled to damages in an amount equal to what they would have received had the 2018 CBA been fully performed.

**VII. Remedies**

*A. Statutory and Contractual Remedies*

ERISA provides the following damages for suits brought by a labor organization against an employer who fails to make required contributions:

(A) Unpaid contributions;

(B) Interest on the unpaid contributions;

(C) An amount equal to the greater of –

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not more than 20 percent ... of the amount determined by the court under subparagraph (A);

(D) Reasonable attorney's fees and costs of the action, to be paid by the defendant; and

(E) Such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).

The CBAs and the Trust Document, which is incorporated into the CBAs by reference, provide for remedies in the event of delinquency. Specifically, Article V, Section 2 of the

Trust Document requires a delinquent employer to pay the following in addition to any delinquent contributions:

1) Interest on any delinquent contributions at a rate of 0.0233% per day, compounded daily until paid;

2) Liquidated damages equal to the greater of interest on all delinquent contributions at a rate of 0.0233% per day; or twenty percent (20%) of the contributions owed on the date the lawsuit was filed; and

3) Reasonable attorney's fees and costs incurred by the Plaintiff Funds in pursuing the delinquent amounts.

Odell Decl., Ex. 4, Art. V, Sec. 2.

In addition, the Trust Document provides that "[i]f an audit or other information reveals that inaccurate reports or insufficient Contributions have been made, the Employer may be required to pay all fees, including audit fees and expenses and also all attorneys' fees and costs incurred in collecting said fees or expenses if legal counsel is engaged or if legal action is necessary to enforce this provision." *See* Odell Decl., Ex. 4, Art. V, Sec. 3.

*B. Plaintiffs' Requested Remedies*

As a result of the audit for the period of January 2020 through December 2022 and for the continued subcontracting violations identified for the period of January 2023 through March 2025, Plaintiffs seek a total of $34,437.14 in damages, consisting of: (1) $2,764.71 in delinquent contributions for the audit period January 2020 through December 2022; (2) $17,876.69 in delinquent contributions as a result of the subcontracting violations identified for the period January 2022 through March 2025; (3) $5,872.87 in interest on all delinquent contributions (calculated through March 6, 2026), to be increased at a rate of 0.0233% per day,

compounded daily, until paid in full; (4) $5,872.87 in liquidated damages (calculated as the greater of the accrued interest on the delinquent contributions or twenty percent (20%) of the delinquent contributions); and (5) $2,050.00 in audit testing fees. Mem. Supp. 5–6; Odell Decl. ¶ 21; Ex. 9; Suppl. Mem. Supp. at 3 (setting forth corrections and clarifications to the damages requested).

In support of Plaintiffs' claim that Pacific BIM failed to comply with its statutory and contractual obligations to timely and fully remit all contributions owed for the period January 2020 through December 2022 and for the subcontracting violations identified for the period January 2022 through March 2025, Plaintiffs provide the declaration of Ellen Odell, the NPF's Payroll Audit Manager. Odell Decl. ¶ 1. Ms. Odell oversees audits of contributing employers' payroll records and determines whether participating employers have satisfied their obligations to submit reports and contributions to the Plaintiff Funds. *Id.* ¶ 2. She also evaluates employer cooperation with the audit process and assists in obtaining reports and contributions from employers who have failed to meet their obligations to the Plaintiff Funds. *Id.* Exhibit 8 attached to the Odell Declaration is a copy of the revised 2024 audit. Exhibit 9 attached to the Odell Declaration is a spreadsheet that provides a detailed breakdown of the total delinquent contributions, accrued interest on those contributions, and the liquidated damages owed by Pacific BIM for each month between January 2020 through March 2025. Exhibit 10 attached to the Odell Declaration is an invoice detailing all audit fees incurred by Plaintiffs in connection with the 2024 audit of Pacific BIM.

As a result of the 2024 audit the Funds learned that Pacific BIM continued to subcontract work to Mr. Ibarra beyond the initial audit review period. ¶ 19. Pacific BIM subsequently produced additional invoices reflecting work performed by Mr. Ibarra during the

full period from January 2023 through March 2025. Odell Decl. *Id.* ¶ 20; Ex. 7. The invoices for subcontracted work performed by Mr. Ibarra during the period from January 2023 through March 2025 are attached as Exhibit 7 to the Odell Declaration. Based on this additional information, the audit was revised on October 27, 2025 to reflect the actual hours worked by Mr. Ibarra in violation of the CBA for the period January 2023 through March 2025. ¶ 20; *see* Exs. 7.

*C. Analysis of Plaintiffs' Requested Remedies*

The Court must now "conduct an inquiry to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999). Damages must be established through "admissible, authenticated evidence." *Bd. of Trs. of the United Union of Roofers v. Dana Restoration, Inc.*, No. 09–CV–1076, 2010 WL 3925115, at *2 (E.D.N.Y. Sept. 14, 2010).

*1. Delinquent Contributions, Liquidated Damages, Interest, and Audit Testing Fees*

Plaintiffs calculated damages for the period January 2020 through December 2022 based on the results of the 2024 payroll audit, which relied on records provided by Pacific BIM. Plaintiffs likewise calculated damages arising from Pacific BIM's subcontracting violations for the period January 2022 through March 2025 based on the hours worked by Mr. Ibarra, as reflected in the results of the 2024 audit and subsequent invoices Mr. Ibarra produced to Plaintiffs. Odell Decl. Ex. 7. Because all damages sought are derived from Pacific BIM's own records, the undersigned finds that they are established with reasonable certainty and supported by admissible evidence.

Moreover, the requested remedy for the subcontracting violations is appropriate because it "comports with the principle that breach of contract damages should place the aggrieved party in the place he would have been in had the breach not occurred." *Karr Bros,*

755 F.2d 1285 at 1290.

Exhibit 9 to the Odell Declaration details Plaintiffs' request for unpaid contributions, liquidated damages, and interest for each month between January 2020 and March 2025. In addition, Exhibit 10 to the Odell Declaration is an invoice setting forth audit fees incurred by Plaintiffs. Upon review, the record establishes that the requested relief from January 2020 through March 2025 is authorized under 29 U.S.C. § 1132(g)(2) and permitted under the terms of the CBAs and Trust Document. Based on the declarations, supporting exhibits, and reports submitted, the undersigned recommends Plaintiffs be awarded $34,437.14 in damages, consisting of: (1) $20,641.40 in total delinquent contributions; (2) $5,872.87 in accrued interest on those delinquent contributions (calculated through March 6, 2026), to be increased at a rate of 0.0233% per day, compounded daily, until paid in full[4]; (3) $5,872.87 in liquidated damages (calculated as the greater of the accrued interest on the delinquent contributions or twenty percent (20%) of the delinquent contributions); and (4) $2,050.00 in audit testing fees. Mem. Supp. 5–6; Odell Decl. ¶ 21; Ex. 9; Suppl. Mem. Supp. at 3 (setting forth corrections and clarifications to the damages requested).

*2. Attorney's Fees and Costs*

Plaintiffs seek attorney's fees and costs pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), and the terms of the Trust Document. *See* Bardes Decl. ¶ 4; 29 U.S.C. § 1132(g)(2) ("[T]he court shall award the plan . . . reasonable attorney's fees and costs of the action, to be paid by the defendant.").

"In calculating an award of attorney's fees, a court must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson*

---

[4] *See* Article V, Section 2 of the Trust Document.

*v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243–44 (4th Cir. 2009). In assessing reasonableness, courts in the Fourth Circuit consider the following twelve factors set forth in *Barber v. Kimbrell's Inc.,* 577 F.2d 216, 226 n. 28 (4th Cir.1978): (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases.

The Fourth Circuit has further emphasized that the "determination of the hourly rate will generally be the critical inquiry in setting the reasonable fee," and that "the burden rests with the fee applicant to establish the reasonableness of a requested rate." *Id.* (citing *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990)). In addition to counsel's own affidavits, "the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." *Id.*

Here, Plaintiffs request an award of attorney's fees and costs in the total amount of $4,927.88, consisting of $4,380.50 in attorney's fees and $547.38 in costs. Bardes Decl. ¶¶ 5–6; Ex 1. The requested attorney's fees are based on 18.5 hours of counsel time spent at a pre-litigation rate of $275 and a litigation rate of $300 per hour for partners and a pre-litigation rate of $155 and a litigation rate of $165 per hour for paralegals. *Id.* ¶ 5. Time spent by counsel includes "researching legal theories, drafting and filing the complaint, arranging for service of

process, drafting and filing clerk's entry of default, and drafting the motion for default judgment and supporting documents." *Id.* Plaintiffs' costs include $128.74 in process server fees, $405.00 in filing fees, and $13.64 in postage. *Id.* ¶ 6.

In support of their request, Plaintiffs have submitted the declaration of counsel, Diana M. Bardes, which summarizes the legal services performed and the fees incurred, and cites comparable ERISA cases in this District approving similar billing rates. *Id.* ¶¶ 5–6, Exs. 2–4. Plaintiffs have also provided detailed billing records identifying the work performed, the date of each entry, the time expended, and the billing professional responsible. *Id.* Ex. 1.

Upon consideration of the *Barber* factors, the undersigned finds that the requested hours and rates are reasonable. In particular, factors (1) the time and labor expended, (3) the skill required, (5) the customary fee, (8) the amount in controversy and results obtained, (9) counsel's experience and ability, and (12) fee awards in similar cases weigh in favor of the requested award. First, the 18.5 hours expended are well within the range typically required for ERISA collection actions, particularly in light of the work required to prepare the Complaint, default-related filings, and the instant motion for default judgment. Second, ERISA litigation is a specialized area requiring subject-matter expertise. Third, the requested rates are consistent with prevailing market rates in the Eastern District of Virginia for attorneys and paralegals handling similar ERISA matters. Fourth, Plaintiffs have demonstrated their entitlement to default judgment and the relief sought. Fifth, the record reflects that Ms. Bardes, a partner at Mooney, Green, Saindon, Murphy, & Welch, P.C., has approximately fifteen years of experience. *See* Bardes Decl. ¶ 2. The undersigned further finds that the requested costs are reasonable and proportionate to the claims asserted.

Accordingly, the undersigned recommends that the Court award Plaintiffs $4,927.88 in

attorney's fees and costs, consisting of $4,380.50 in attorney's fees and $547.38 in costs. Bardes Decl. ¶¶ 5–6, Ex. 1.

*3. Post-judgment Interest*

An award of post-judgment interest on the liquidated damages, audit testing fees, and attorney's fees and costs is appropriate to ensure that Plaintiffs receive the proper value of the damages awarded against Pacific BIM, regardless of when Plaintiffs may be able to collect such damages. The post-judgment interest is to be calculated in accordance with 28 U.S.C. § 1961.

A court shall order post-judgment interest "on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a); *ExxonMobil Oil Corp. v. Black Stone Petroleum Inc.*, 221 F. Supp. 3d 755, 769 (E.D. Va. 2016), *judgment entered*, No. 1:16-CV-148, 2016 WL 6657395 (E.D. Va. Nov. 9, 2016) (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1031 (4th Cir. 1993) ("federal law mandates the awarding of post judgment interest")); *PharMerica East, LLC v. Healthlink of Va. Shores, LLC*, 2020 WL 877983, at *3 (E.D. Va. Feb. 20, 2020) ("In the Fourth Circuit, post-judgment interest can be awarded on the entire amount the court awards.") (internal citations omitted); *Barrella v. Village of Freeport*, 43 F. Supp. 3d 136, 195 (E.D.N.Y. 2014) ("Post judgment interest is available for an award of attorney's fees arising out of a judgment in the district court.") (internal quotation marks and citations omitted).

Here, an award of post-judgment interest, to be calculated in accordance with 28 U.S.C. § 1961, is appropriate on the liquidated damages, audit testing fees, and attorney's fees and costs. However, post-judgment interest is not appropriate on the delinquent contributions awarded because Plaintiffs are already entitled to contractual interest on those amounts at a

rate of 0.0233%, compounded daily until paid in full, and any additional post-judgment interest would constitute an unwarranted windfall.[5]

**VIII. Recommendations**

For the foregoing reasons, and upon review of the entire record in this matter, the undersigned recommends the Court:

(1) **GRANT** Plaintiffs' Motion for Default Judgment against Pacific BIM;

(2) **ENTER** judgment against Pacific BIM in the total amount of $39,365.02, consisting of (i) $20,641.40 in total delinquent contributions, (ii) $5,872.87 in accrued interest on those delinquent contributions through March 6, 2026, (iii) $5,872.87 in liquidated damages, (iv) $2,050.00 in audit testing fees, and (v) $4,927.88 in attorney's fees and costs.

(3) **AWARD** interest on the delinquent contributions at the contractually agreed-upon rate of 0.0233% per day, compounded daily, from March 7, 2026 until paid in full; and

(4) **AWARD** post-judgment interest, to be calculated in accordance with 28 U.S.C. § 1961, on the awarded liquidated damages, audit testing fees, and attorney's fees and costs.

**IX. Notice**

The parties are advised that objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of its service. Failure to object to this Report and Recommendation waives appellate review of any judgment based on it.

William E. Fitzpatrick
WILLIAM E. FITZPATRICK
UNITED STATES MAGISTRATE JUDGE

April 10, 2026
Alexandria, Virginia

[5] *See* Article V, Section 2 of the Trust Document.